## STATE v. JOHN MAGUIRE.[1]

April 21, 1933.

No. 29,462.

[1]Reported in 248 N. W. 216.

*Irving L. Eckholdt,* for appellant.

*Harry H. Peterson,* Attorney General, *Roy C. Frank,* Assistant Attorney General, and *Hayes Dansingburg,* County Attorney, for the state.

WILSON, CHIEF JUSTICE.

Defendant appealed from an order denying his motion for a new trial and also from a judgment of conviction of the crime of wilfully and unlawfully depriving a horse of necessary food by reason of which the horse died.

Defendant owns a 320-acre farm in Olmsted county. In the fall of 1929 the farm was unoccupied. Defendant then entered into an agreement with Owen Jones, Carl Blakely, and Mrs. O. F. Teeter by the terms of which he rented them the 70-acre pasture thereon at a specified price. On October 9, 1929, they put about 65 horses in the pasture. Testimony in the case hereinafter mentioned, in connection with the claims of the amount of rent, would indicate that it might have been 55 horses. On October 10, 1929, defendant leased 280 acres of the farm to Carroll Harwood, who took possession. The other 40 acres were not in said pasture. Harwood did not know of the horses' being in the pasture until he took possession. Some of the horses remained in the pasture until the following February. In the meantime 39 died. The one involved in this action died about January 8, 1930. The state claims it was starved to death for want of food.

The evidence shows that the grass in the pasture was insufficient to feed the horses therein. One witness testified that the pasture was "as bare as a floor." The evidence is that the horses became poorer and poorer. There is opinion testimony to the effect that the particular horse was starved to death, which is corroborated by other testimony and circumstances. The evidence is sufficient to support a finding by the jury that the horse's death resulted from starvation.

■ Every person who shall deprive an animal of which he has charge or control of the necessary food shall be guilty of a misdemeanor. G. S. 1923 (2 Mason, 1927) § 10443.

Defendant did not own the horse, but the state claims he was in possession, charge, and control—holding the horse under a claim of lien for the pasture rent; and such a lien right is given by G. S. 1923 (2 Mason, 1927) §§ 8507-8508. Under the law defendant was authorized to retain possession until such lien was satisfied. On the trial he disclaimed so holding the horse, as well as any responsibility for its not having food.

At the end of the first month, after the horses were placed in the pasture, a controversy arose between defendant and the owners of the horses as to the amount of the pasture rent. The owners claimed they owed him $55. They claimed the rent to be $1.00 per month per head. Defendant claimed the amount was $1.50 per month for each horse. At the end of the first month, when this dispute arose, defendant said to them:

"I am going to charge you fellows $1.50 a month."

Teeter said to Mr. Jones: "Did you agree to give him $1.50 a month?"

Jones said: "No, Mr. Maguire, it was $1.00 a month."

Maguire then further stated: "No, I want $82.50, and I am going to have it."

Teeter told him he would not pay that, so he and Jones left. Teeter also testified that they went to the farm the day after Christmas, and the horses were poor, very weak, and that Harwood would not let them have the horses. He testified that some of them had died and that they were starved.

In January defendant told one Albert Smalley that the owners would never get the horses until he got his money for the pasture.

Harwood was on the farm. He claimed the rent after the first month. It seems that Maguire and he agreed to that. Harwood says so. On December 31, 1929, Harwood wrote Jones as follows:

"Do you care to settle for your pasture rent and the horses, with me now, or will we have to agree by law?

"Here is my offer, if you can come down January 3-30.

"I will take $82.50 for the first month and the *Grey Gelding* in the pasture for the remaining part.

"I would like to get straightened up without trouble and I think it would be less cost to you."

Harwood was apparently acting for defendant in trying to collect the $82.50 claimed by defendant for the first month's rent. On February 3, 1930, defendant's lawyer wrote to Harwood and among other things said:

"Mr. Smith was in and requested that I ask you to let the plaintiff take 15 head of those horses tomorrow, February 4th. I don't see that you would be damaging your rights by letting him have some of those horses. As far as Maguire is concerned, it is all right with him."

To what did the words "your rights" refer if not to a lien right to retain possession? It will be observed that Maguire's consent was also obtained. Why? Why was this necessary if the horses were not held to secure the payment of his rent? Apparently the parties were acting upon the assumption that the remaining horses were sufficient security. The number that died up to that time is not disclosed.

After complaint had been made to the town board and to the county attorney as to the condition of these horses, defendant bought posts and wire, and Harwood inclosed 15 more acres for pasture, to which the horses were given access. Why this contribution in material and labor if they were not holding these horses for their rent? If they were not so holding the horses, it would seem the natural thing for them to have made some move to rid themselves of the horses.

A little later Harwood did consult a lawyer about the horses. He seems then to have been moved by their starving condition. The lawyer reported their condition to the county attorney. Harwood approved this, but he wanted the money due. Harwood testified that the lawyer told him as long as he kept the horses in his possession that he had a lien on them. It may be inferred that Har-

wood was more interested in getting the money than in protecting the horses. He knew their condition. His testimony upon the trial is rather interesting. On cross-examination we find this testimony:

By Mr. Manahan: Q. "Do you remember in the trial in municipal court I asked you this question, Mr. Harwood: 'Isn't it a fact that these horses were starved to death?' Do you remember me asking you that question?

A. "Yes, sir.

Q. "And do you remember that you answered it, 'Yes, sir,' isn't that right?

A. "It took quite a while before you could get me to answer.

Q. "Well, didn't you, when I said: 'Isn't it a fact that these horses starved to death?'

Mr. Lamberton: "Just treat the witness as a gentleman.

Q. "Didn't you say, 'Yes, sir'?

A. "Well, after you hammered and tried about it.

The Court: "Never mind about that.

Mr. Manahan: "You know better than that.

Q. "Didn't you say, 'Yes, sir,' when I asked you if those horses starved to death? You can answer yes or no.

A. "Yes, sir, I did."

We are of the opinion that the evidence is sufficient to support a finding by the jury to the effect that while this horse was starving to death defendant was retaining possession thereof under a claim of lien thereon, as security for the payment of agreed pasture rental. If so, he cannot escape responsibility for the starving of the horse.

Affirmed.